809 P.2d 649

**WING PAWN SHOP, Appellant,**

v.

**TAXATION AND REVENUE DEPARTMENT FOR the STATE OF NEW MEXICO, Appellee.**

No. 10555.

Court of Appeals of New Mexico.

March 12, 1991.

Daniel A. Sanchez, Campos & Sanchez, P.A., Santa Fe, for appellant.

Tom Udall, Atty. Gen., Deborah A. Moll, Sp. Asst. Atty. Gen., Taxation and Revenue Dept.; Santa Fe, for appellee.

## OPINION

APODACA, Judge.

Wing Pawn Shop, a sole proprietorship owned by Michael Whalen (taxpayer), appeals from an order of the taxation and revenue department (department). The order denied taxpayer's protest of a gross receipts tax assessment of $11,460.11, plus

penalty and interest. Four issues are raised on appeal: whether (1) there is substantial evidence to support the hearing officer's order; (2) taxpayer met his burden of proving that certain "pawn sales" were exempt from gross receipts tax; (3) the department is estopped from denying taxpayer's claim to an exemption or deduction; and (4) the department afforded taxpayer a fair hearing under due process principles. We consolidate the first two issues under our discussion of the sufficiency of the evidence. Taxpayer's issues give rise to a question of first impression in New Mexico—whether a pawn broker's receipts from sales of pawned chattel are exempt or deductible from gross receipts tax as the recoupment of principal, interest, and handling charges attendant to the initial loan transaction? We hold that such receipts are not so exempt or deductible under the facts of this appeal. We thus affirm the department's order on all issues.

FACTS

The department audited taxpayer's business for the years 1982–85. At the formal hearing reviewing the assessment, both parties agreed that there was only one issue to be heard: whether taxpayer's disposal of a pawnor's chattel was subject to taxation pursuant to NMSA 1978, Section 7-9-4 (Cum.Supp.1981 and Repl.Pamp. 1983), which was applicable during the audited period.

The evidence indicated that, in conducting its business, taxpayer engaged in three different types of transactions: (1) purchasing property outright without any attendant loan of money, then offering it for sale; (2) taking property as collateral for a loan and the item was subsequently redeemed by the borrower; and (3) taking property as collateral for a loan and, in the event of the borrower's default, offering it for sale. We are concerned in this appeal only with the third type of transaction.

During his testimony, taxpayer described the regular course of his business in handling pawn transactions. A patron, known as a pawnor, brings chattel to the taxpayer. Taxpayer "loans" the pawnor cash for the item. These parties agree in writing that if the pawnor pays back the cash plus interest within 120 days, then the pawnor has an absolute right to redeem the chattel. If the pawnor does not redeem the chattel within the 120 days, however, taxpayer sends the pawnor written notice of default. This notice states that the taxpayer "proposes to dispose of the [chattel] in satisfaction of [the pawnor's] obligation." The pawnor receives no further notice of the disposition of the chattel. After the pawnor defaults, taxpayer exercises exclusive dominion over the property, at times retaining it for office use but most often offering it for sale to the public. He decides on a resale price based on the loan amount (principal), accrued interest, repair costs, and market value.

The department presented evidence (provided by taxpayer) of sixteen transactions from taxpayer's business. These transactions covered six random days during the assessment period. The department also presented other evidence of what appeared to be sequential transactions from other time periods. Both the department's auditor and the taxpayer agreed that the sixteen transactions fairly represented the manner in which taxpayer did business. The department's evidence indicated that taxpayer made substantial sums on each item of disposed chattel. These sums exceeded the stated loan principal and interest amounts. For example, in one instance, taxpayer loaned a pawnor $75.00 for a handgun and disposed of it for $125.55.

Taxpayer testified that the amount obtained over the amounts represented by the loan principal and interest covered his costs. These costs included loan setup charges, chattel maintenance, disposal costs, and accrued interest. Taxpayer also stated there was never any surplus after disposition of the chattel to third parties. Instead, according to him, the entire amount received from the sale of a chattel represented satisfaction of the original loan principal plus costs and interest. Yet, he could not describe what amount was attributable to costs and interests for any particular item he sold. While reviewing sample records from his business, he was unable to

point to records of his costs and lost interest on defaulted loans. He also offered two sample transactions. These showed that upon resale, he received revenue substantially closer to his initial cost than the department's examples.

Taxpayer also testified that his nonpayment of taxes was based on his interpretation of, and his reliance on, a department regulation. The record reflects he first heard of this regulation when the department referred to it in a response to taxpayer's protest. That response was an undated letter with the date April 22, 1986, stamped on it.

## SUFFICIENCY OF THE EVIDENCE

■ Before addressing this issue, we first summarize the standard by which we review the sufficiency of the evidence in administrative proceedings. On appeal from an agency determination, we determine whether, viewing the evidence in a light most favorable to the agency's decision, the findings have substantial support in the record as a whole. *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 767 P.2d 363 (Ct.App.1988). *See also Sanchez v. New Mexico Dep't of Labor, Employment Sec. Div.*, 109 N.M. 447, 786 P.2d 674 (1990). Under this standard, we review whatever evidence " 'fairly detracts' " from the administrative findings as well. *Id.*, 108 N.M. at 129, 767 P.2d at 368 (*quoting Universal Camera Corp. v. National Labor Relations Bd.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). If the agency decision is not justified by a fair estimate of the worth of the evidence, then we reverse findings based on that evidence. *Id.*, 108 N.M. at 129, 767 P.2d at 368.

Taxpayer and the department agree that redemption of property by a borrower or pawnor, where principal and interest are paid to obtain the return of the pledged property, is not subject to gross receipts tax because the portion of the payment representing interest is exempt under NMSA 1978, Section 7-9-25. The remaining portion of the payment represents a return of loan principal that does not fall within the definitions of gross receipts, NMSA 1978, Section 7-9-3(F), and loan

handling charges, which are deductible under NMSA 1978, Section 7-9-61.1.

Taxpayer argues that the department's decision and order were not supported by substantial evidence. Taxpayer also asserts that pawn sales fall within the statutory exemption set forth in Section 7-9-25 and within the statutory deduction under Section 7-9-61.1. Specifically, taxpayer argues that his disposal of pledged property after a pledgor's default does not result in the sale proceeds becoming taxable as a matter of law. Taxpayer also contends there was no evidence to support findings that he owed unpaid gross receipts taxes from his two pawn shop businesses. *Compare Stohr v. New Mexico Bureau of Revenue*, 90 N.M. 43, 559 P.2d 420 (Ct.App. 1976) *and New Mexico Enters., Inc. v. Bureau of Revenue*, 86 N.M. 799, 528 P.2d 212 (Ct.App.1974); *see also* NMSA 1978, § 7-9-3(F) ("gross receipts" include only commissions if sale is by agent or broker). Taxpayer intimates that, because he liquidated the pledged chattel to satisfy the debt, he comes within the exception from the taxation statutes the parties presume exist. We disagree.

■ The rights and remedies under the Uniform Commercial Code (UCC) and the Pawnbrokers Act, NMSA 1978, Sections 56-12-1 through 56-12-16 (Repl.Pamp. 1986), explain our disagreement. The Pawnbrokers Act contains no effective date as originally enacted. *See* N.M.Laws 1985, ch. 228, §§ 1-16. The effective date of the Act was thus June 14, 1985. *See* N.M. Const. art. IV, § 23. Therefore, the Act only applies to those pawns arising after the effective date of the Act. *See Rubalcava v. Garst*, 53 N.M. 295, 206 P.2d 1154 (1949), *superseded on other grounds*, 56 N.M. 647, 248 P.2d 207 (1952).

■ Upon a pawnor's default, taxpayer had two choices under the UCC. He could retain the collateral in satisfaction of the debt, thus foregoing any deficiency judgment. NMSA 1978, § 55-9-504(2) (Repl.Pamp.1987). Having made this choice, taxpayer was required to give the pawnor notice of the intent to keep the property. *Id.* The pawnor had a coinciden-

tal right to force the taxpayer to sell the property. *Id.* Alternatively, taxpayer could proceed with liquidation of the collateral in a commercially reasonable manner. NMSA 1978, § 55–9–502(2) (Repl.Pamp. 1987). Under this particular choice, taxpayer would have the right to claim any deficiency or an obligation to return any surplus after the sale. *Id.* The same is true if the pawnor forced taxpayer to sell the chattel.

■ We recognize that taxpayer's notice to pawnors of his desire to retain the collateral bears a resemblance to the notice required under the UCC and the Pawnbrokers Act. *See* § 55–9–505(2); § 56–12–11(C); *see also Begay v. Foutz & Tanner, Inc.,* 95 N.M. 106, 619 P.2d 551 (Ct.App.1979), *rev'd on other grounds sub. nom, Reeves v. Foutz & Tanner, Inc.,* 94 N.M. 760, 617 P.2d 149 (1980). However, Section 55–9–505(2) requires notice of a 21–day redemption period. In addition, to comply with the UCC, the notice would have to state that taxpayer intended to "dispose" of the chattel to satisfy the debt. *Id.* Taxpayer's notice did not meet these requirements. In addition, there is no evidence that taxpayer ever refunded to the pawnors any surplus after sale. *See* § 55–9–504(2) (requiring refund of surplus after disposal of collateral); § 56–12–11(C) (requiring refund of surplus together with notice to pawnor of the right to the surplus).

We refrain from determining, as the parties would have us do, whether taxpayer's sales practices complied with UCC requirements of commercial reasonableness. We will attempt, however, to determine whether this intent essentially meant that taxpayer took ownership of the chattel from the pawnors, made it a part of his inventory, and then sold it. If that is the case, then taxpayer was not acting as an agent for the pawnors to fulfill their obligations. He was instead acting as a purveyor of used chattel. *See Reeves v. Foutz & Tanner, Inc.;* New Mexico Enters., Inc. v. Bureau of Revenue.

■ We conclude that there was substantial evidence that taxpayer operat-ed his collateral liquidation with characteristics of an intention to: (1) retain the collateral in satisfaction of the debt; and (2) not account to the pawnors after sale. Taxpayer's retention of the surplus over the amount necessary to satisfy the debt and liquidation costs may not fit within any commercial practice the UCC authorizes. *See Reeves v. Foutz & Tanner, Inc.* (to retain collateral in satisfaction of debt, creditor must intend to make personal use of the collateral). However, "[w]hen a creditor retains the collateral in discharge of the debt, he becomes owner." *Begay v. Foutz & Tanner, Inc.,* 95 N.M. at 111, 619 P.2d at 556. When taxpayer, as a creditor, sold the collateral upon default of the pawn agreements, his control over the goods was absolute. He thus stood in a position analogous to the taxpayer in *New Mexico Enterprises, Inc.* Taxpayer was not an agent of the pawnors. His contention that the entirety of his transactions were collateral liquidations does not put them beyond the reach of the taxation statutes.

■ We next discuss the specific principles applicable to a review of appeals involving taxation of a transaction by the state. We recently enunciated these principles in *Security Escrow Corp. v. State Taxation and Revenue Department,* 107 N.M. 540, 543, 760 P.2d 1306, 1309 (Ct.App. 1988):

Where an exemption or deduction from tax is claimed, the statute must be construed strictly in favor of the taxing authority, the right to the exemption or deduction must be clearly and unambiguously expressed in the statute, and the right must be clearly established by the taxpayer.

Once it is determined that a tax is applicable, after allowing for any statutory deduction, the statute permitting the deduction must be narrowly, yet reasonably construed. "A tax statute must also be given a fair, unbiased, and reasonable construction, without favor or prejudice to either the taxpayer or the State, to the end that the legislative intent is effectuated and the public interests to be subserved thereby are fur-

thered." [*Chavez v. Commissioner of Revenue,* 82 N.M. 97, 99, 476 P.2d 67, 69 (Ct.App.1970).]

Thus, taxation is the rule and the claimant for an exemption must show that his demand is within the letter as well as the spirit of the law. [Citations omitted.]

Additionally, NMSA 1978, Section 7–9–5 creates a presumption of taxability, which a taxpayer has the burden of overcoming. *See also* NMSA 1978, § 7–9–12.

Bearing these review principles in mind and having considered the evidence adduced at the administrative hearing, we hold that taxpayer failed to meet his burden of proof to establish clearly his entitlement to an exemption or deduction.

 Taxpayer relies on two statutory provisions in his argument that the receipts in question were not subject to gross receipts tax. These provisions are NMSA 1978, Section 7–9–25 (Repl.Pamp. 1980 and Repl.Pamp.1983) and NMSA 1978, Section 7–9–61.1 (Cum.Supp.1982 and Repl. Pamp.1983). Section 7–9–25 provides: "Exempted from the gross receipts tax are the receipts received as interest on money loaned or deposited, receipts received as dividends or interest from stocks, bonds or securities or receipts from the sale of stocks, bonds or securities." Section 7–9–61.1 states that "[r]eceipts from charges made in connection with the origination, making or assumption of a loan or from charges made for handling loan payments may be deducted from gross receipts."

Taxpayer does not dispute that the proceeds derived from the taxpayer's pawn sales qualify as "gross receipts" under NMSA 1978, Section 7–9–3(F) (Supp.1981, Cum.Supp.1982, Repl.Pamp.1983 and Supp. 1984). That statute states that " 'gross receipts' means the total amount of money or the value of other consideration received from selling property in New Mexico." We construe taxpayer's argument on appeal as essentially that receipts from pawn sales are either exempt as "interest on money loaned" under Section 7–9–25 or deductible as "receipts from charges" specified in Section 7–9–61.1.

Yet, the record is absent of any showing by taxpayer that he kept an accounting or itemization on what portion, if any, of the sale proceeds represented "interest on money loaned" to qualify as an exemption under Section 7–9–25. Neither did taxpayer's record-keeping procedures demonstrate what part of the sale proceeds or receipts represented "receipts from charges" as specified under Section 7–9–61.1 to qualify as a deduction. Instead, the record clearly indicated that, although taxpayer used loan cards initially when transacting the original loan with a pawnor, which specified only one month's interest, his records did not reflect further entries of charges or interest that would qualify as exemptions or deductions.

The bookkeeping records submitted by taxpayer also reflected that, although he may have initially taken the pawned item as collateral for a loan previously made, once the pawnor failed to redeem the item, it was sold by taxpayer as his property. It is true that taxpayer testified he considered any difference between the amount borrowed and the amount received from the sale simply as a recovery of costs, interest, and handling charges. However, taxpayer's failure to maintain specific records to substantiate his argument that the sale price merely represented a recoupment of costs and other charges, as well as interest, leads us to the inescapable conclusion that he failed to establish clearly his right to either an exemption or deduction as required. *See Security Escrow Corp. v. State Taxation & Revenue Dep't.*

We agree with the department's observation that "[t]his sliding-scale of recovery, * * * did not depend on any accounting of [taxpayer's] true costs, but was a function of how much he was able to make through the sale of the article." We thus hold that, in the absence of any supporting accounting records or other documentation kept by taxpayer with respect to interest earned, handling costs and charges, or costs of repair, the department was justified in its assessment of gross receipts tax. We conclude that the hearing officer's order is supported by substantial evidence in the

whole record, because taxpayer failed to establish clearly that he was entitled to either an exemption or deduction.

■■■ Taxpayer's reliance on the department's G.R. Regulation 20:1 to establish his entitlement is misplaced. The statute under which the regulation was promulgated was repealed before the audit period in question in this appeal. We interpret that legislative action as nullifying enforcement or application of the regulation.

## ESTOPPEL OF THE DEPARTMENT

■■■ Taxpayer argues that we may apply estoppel principles against the department if it misled taxpayer into thinking he did not owe the tax and he justifiably relied on the department to his detriment. *See Mountain States Advertising, Inc. v. Bureau of Revenue*, 89 N.M. 331, 552 P.2d 233 (Ct.App.1976). We agree with taxpayer's statement of the law. *See also Taxation & Revenue Dep't v. Bien Mur Indian Market Center, Inc.*, 108 N.M. 228, 770 P.2d 873 (1989) (estoppel applied only pursuant to statute or when right and justice so require). We disagree, however, that such principles are applicable here to estop the department from denying taxpayer's protest. In support of his argument that estoppel principles are relevant here, taxpayer maintains that, before the audit period in question, representations justifying estoppel were made by the department "that income derived from sales of non-redeemed collateral was exempt from gross receipts." Yet, taxpayer relies solely on the undated letter he received in 1986 in response to his protest. The record is absent of any prior representations, aside from taxpayer's bald assertion that they were made.

We reject taxpayer's estoppel arguments for two reasons. First, the undated letter, even if we assume that it misled taxpayer into believing the sale proceeds were not subject to gross receipts tax, was transmitted to him after, not before, the transactions in question occurred. It is difficult for us to fathom how a departmental communication to taxpayer *after* he had failed to pay gross receipts tax can be reasonably relied on for application of estoppel principles under *Mountain States Advertising*. Second, the letter in question expressly relied on G.R. Regulation 20:1 as *justifying* imposition of the gross receipts tax, *not* exempting the pawn sales from the tax. It is quite apparent to us, then, that taxpayer did not show he failed to pay taxes based on, or in reliance of, the department's representations, which the law requires. *See Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 654 P.2d 548 (1982); *cf.* NMSA 1978, § 7–1–60 (Repl. Pamp.1990) (department estopped by regulation or written ruling limiting liability).

## DENIAL OF A FAIR HEARING

Taxpayer contends the department deprived him of a fair hearing in two ways: (1) the department "switched" issues on him; and (2) the hearing officer was biased. We shall consider each of these separately.

### 1. *"Switching" of Issues.*

■■■ Taxpayer contends the department specified certain issues at the beginning of the hearing and then changed them over the course of the hearing. We first note that the parties appeared to agree on the focus of the hearing at the outset. Taxpayer stated that there was only one legal issue—whether the differential between his cost basis for the collateral and the sale price was taxable. The department's attorney stated that was indeed an issue. He added, however, that there remained a factual dispute over whether taxpayer could prove that he had principal, interest and costs equal to the price differential.

On appeal, taxpayer states that the UCC article 9 issue came as a surprise to him, since he had received no notice that it was to be an issue at the hearing. We cannot say the department denied taxpayer a fair hearing due to inadequate notice. Taxpayer states that *Shaw v. Valdez*, 819 F.2d 965 (10th Cir.1987), involving a dragnet notice of hearing that opened up every issue at the formal hearing, is analogous to this case. The difficulty in attempting to analogize *Shaw* to this appeal is that the notice of hearing in *Shaw* was restated in the form of a civil complaint. Under Federal

Rule of Civil Procedure 12, the federal appellate court took the facts of the notice of hearing as pled by the plaintiff. The federal appellate court could compare the notice and the hearing for discrepancies.

Here, taxpayer's attempt to demonstrate that the department deprived him of a fair hearing fails because he did not designate the notice of hearing as part of the record or demonstrate that there was no notice. We presume the department followed all proper procedures, including procedures to ensure fair notice of a hearing. *See McLeod v. I.N.S.,* 802 F.2d 89 (3rd Cir. 1986); *Organized Fishermen of Florida v. Hodel,* 775 F.2d 1544 (11th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986). With no evidence to the contrary, because of taxpayer's designation of an incomplete record, the presumption of administrative regularity stands unrebutted and not reviewable. *See State ex rel. Alfred v. Anderson,* 87 N.M. 106, 529 P.2d 1227 (1974). We conclude that, based on the record before us, taxpayer received fair notice of the substance of the hearing.

### 2. *Bias of Hearing Officer.*

██ Taxpayer's second contention apparently is based on the notion that the hearing officer was so biased that taxpayer could not receive a fair review of the evidence. Although taxpayer cites no authority for this argument, and thus we need not consider it on appeal, *see In re Adoption of Doe,* 100 N.M. 764, 676 P.2d 1329 (1984), we shall address it nevertheless.

Taxpayer's argument is that the department's attorney prosecuting the case also appeared to be directing the hearing officer. We recognize that the commingling of prosecutorial and judicial functions may be inappropriate. *See generally Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950) (interpreting federal Administrative Procedures Act). The department's hearing officer should not "be responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for the department." Tax Admin.Regulation 24:5(C) (1985).

The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry [than if the proceeding was in a court of law]. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975).

██ We determine that, in the administrative proceedings here, there was admirable cooperation and detachment among all present. The parties conducted themselves to the prejudice of no one. Generally, the hearing officer received evidence through stipulated admission or without objection. The only time taxpayer objected to any evidence was when the department offered its exhibit five. The hearing officer heard argument from both sides and appeared to have made an informed decision. These facts simply do not carry taxpayer's heavy burden of overcoming the presumption of administrative regularity. The record simply does not reflect any indication that the hearing officer did not fairly review the evidence. On the contrary, the conduct below, based on our review of the record, evinces nothing other than fairness. We thus hold there was no bias depriving taxpayer of a fair hearing.

### CONCLUSION

In summary, we hold that a pawnbroker's receipts from pawn sales, under the facts of this appeal, are not exempt or deductible from gross receipts tax as the recoupment of principal, interest, and handling charges attendant to the initial loan

transaction by which the pawned chattel was acquired. We conclude that: (1) substantial evidence in the whole record supported the hearing officer's order denying taxpayer's protest; (2) the department was not estopped from denying taxpayer's claim to an exemption or deduction; and (3) the department afforded taxpayer a fair hearing under due process principles. We therefore affirm the hearing officer's order. Taxpayer requests fees and costs on appeal. Not only has he not cited any authority for this entitlement, but he has not prevailed on appeal. The parties shall bear their own respective costs and fees. *See* SCRA 1986, 12–403(A); *Alber v. Nolle*, 98 N.M. 100, 645 P.2d 456 (Ct.App.1982).

IT IS SO ORDERED.

DONNELLY, J., concurs.

HARTZ, J., specially concurs.

HARTZ, Judge (specially concurring).

I concur in the result.

TAXABILITY OF THE TRANSACTION

When the pawnshop sold pawned items, it was responsible for gross receipts tax on the full sales price, unless the pawnshop could establish that it was acting only as an agent of the pawnor in the sale. On the evidence in this case, which is summarized in Judge Apodaca's opinion, the hearing officer was not compelled to find that taxpayer had satisfied his burden of proving that he acted as the pawnor's agent. Therefore, we must affirm.

The pertinent part of the statutory definition reads: " '[G]ross receipts' means the total amount of money or the value of other consideration received from selling property in New Mexico[.]" NMSA 1978, § 7–9–3(F) (Repl.Pamp.1990). So long as the seller owns the property, the manner in which the seller acquired the property is irrelevant. The seller may have found the property, acquired it in satisfaction of a debt, traded for it, or purchased it, perhaps at a cost greater than the sale price. No matter what the manner of acquisition, the seller-owner's sale price is a gross receipt. One who is engaged in business must then pay a tax on the gross receipt. NMSA 1978, § 7–9–4(A) (Repl.Pamp.1990).

When, however, the seller is not the owner, but is selling the item only as agent for the owner, the only gross receipt for which the seller is taxable is the seller's commission. *See* § 7–9–3(F) (defining "gross receipts" to include agent's commissions); *Stohr v. New Mexico Bureau of Revenue*, 90 N.M. 43, 559 P.2d 420 (Ct.App.1976) (carpenter not responsible for gross receipts tax with respect to materials purchased as agent for carpenter's customer); *New Mexico Enters., Inc. v. Bureau of Revenue*, 86 N.M. 799, 528 P.2d 212 (Ct. App.1974) (motel management consultant not acting as agent of motels for whom it purchased supplies).

A pawnshop could act as the agent of a pawnor who is unable to raise the money to pay the principal and interest owed to pawn the item. The pawnshop could sell the item and remit the proceeds to the pawnor, who could then pay the pawnshop its commission, the principal owed, and the accrued interest. As already stated, the commission would be a gross receipt of the pawnshop and would be subject to tax. The principal and interest paid by the pawnor to the pawnshop would not be taxable. *See* NMSA 1978 § 7–9–25 (Repl.Pamp.1990) (receipts received as interest on money loaned is exempt from gross receipts tax). More realistically, the pawnshop would retain from the sale proceeds the amount owed it by the pawnor and remit any excess to the pawnor. *Cf.* NMSA 1978, § 56–12–11(C) (Repl.Pamp.1986) (requiring pawnshop to remit to pawnor any surplus from sale). The tax consequences should be the same whether or not the money actually passes from the pawnshop to the pawnor and back to the pawnshop.[1]

The question in this case was whether the taxpayer did in fact act as an agent of

---

1. I have intentionally refrained from expressing a view on the gross-receipts-tax treatment of a pawn service charge, *see* NMSA 1978, § 56–12–13 (Repl.Pamp.1986), which may be deductible in whole or in part from gross receipts as a loan origination or handling charge. *See* NMSA 1978, § 7–9–61.1.

the pawnors when he sold pawned items. Taxpayer failed to convince the hearing officer. On this record, we should not reverse the hearing officer's determination.

ESTOPPEL

I also agree that the department was not estopped by its letter to taxpayer. My only difference with the majority in this regard is that I would place greater emphasis on NMSA 1978, Section 7–1–60 (Repl.Pamp. 1990), which sets forth circumstances in which the director may be estopped. We should be cautious about estopping the state in matters relating to the public fisc. *See Office of Personnel Management v. Richmond,* — U.S. —, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). When the legislature has spoken directly on the issue of estoppel against the state, we should be most reluctant to expand the circumstances in which we find estoppel. I read *Taxation & Revenue Dep't v. Bien Mur Indian Mkt. Center, Inc.,* 108 N.M. 228, 770 P.2d 873 (1989), as indicating that ordinarily reliance by a taxpayer is not justifiable unless it is reliance expressly permitted by Section 7–1–60.

FAIR HEARING

I agree that taxpayer has not shown that he was deprived of a fair hearing.